## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

MYRIAM PARADA,

           Plaintiff,

v.

ANOKA COUNTY; JAMES STUART, *Anoka County Sheriff*;  JOHN DOE, *an unknown deputy/employee of the Anoka County Sheriff's Department*, JANE DOE, *an unknown deputy/employee of the Anoka County Sheriff's Department*, CITY OF COON RAPIDS, and NICOLAS OMAN, *Coon Rapids Police Officer; all individuals being sued in their individual and official capacity*,

           Defendants.

Civil No. 18-795 (JRT/TNL)

**MEMORANDUM OPINION AND ORDER**

---

Alain M. Baudry, **SAUL EWING ARNSTEIN & LEHR LLP**, 33 South Sixth Street, Suite 4750, Minneapolis, MN 55402; Ian Bratlie, **ACLU of MN**, 709 South Front Street, Suite 1B, Mankato, MN 56001; Amanda R Cefalu, **KUTAK ROCK**, 60 South Sixth Street, Suite 3400, Minneapolis, MN 55402, for plaintiff.

Andrew T. Jackola, **ANOKA COUNTY ATTORNEY**, 2100 3rd Avenue, 7th Floor, Government Center, Anoka, MN 55303, for defendants Anoka County, James Stuart, and Jane and John Doe.

Ryan M Zipf, **LEAGUE OF MINNESOTA CITIES**, 145 University Avenue West, St. Paul, MN 55103, for defendants City of Coon Rapids and Nikolas Oman.

Plaintiff Myriam Parada seeks compensatory and punitive damages, a permanent injunction, and declaratory judgment for alleged violations of the U.S. Constitution, Minnesota Constitution, and common law, following a July 2017 car accident and the ensuing actions of a Coon Rapids Police Officer and employees at the Anoka County Jail.

The parties have filed cross motions for summary judgment.  In dispute are Parada's claims against Coon Rapids Police Officer Nicolas Oman for actions related to her arrest, and Parada's claims against Anoka County and its Sheriff James Stuart for actions related to her continued detention and implementation of an unwritten policy that requires Anoka County Jail employees to contact Immigration & Customs Enforcement ("ICE") any time a foreign-born individual—irrespective of citizenship or immigration status—is presented to the Anoka County Jail.[1]

The Court will grant in part and deny in part Officer Oman's Motion for Summary Judgment.  The Court will grant summary judgment to Officer Oman on Parada's Fourth Amendment and False Imprisonment claims (Counts I and VIII) because no genuine dispute of material fact remains, and no reasonable jury could conclude that Officer Oman

---

[1] Parada does not dispute that the City of Coon Rapids and John and Jane Doe, anonymous Anoka County Jail employees, are entitled to summary judgment on all Counts alleged against them. Parada also does not dispute that Officer Oman is entitled to summary judgment on Counts VI and VII, which allege violations of the Minnesota Constitution.  The Court will grant summary judgment on these Counts to the described Defendants.

unreasonably extended the traffic stop or lacked probable cause to arrest Parada.  The Court will, however, deny Oman summary judgment on Parada's Fourteenth Amendment Equal Protection Clause claim (Count IV) because a genuine dispute of material fact remains as to whether Oman selectively enforced the law based on Parada's race, alienage, or national origin.

The Court will grant in part and deny in part Anoka County and Sheriff Stuart's Motion for Summary Judgment. The Court will grant summary judgment to Anoka County and Sheriff Stuart on Parada's Fourth Amendment claim (Count I) and her Fourteenth Amendment procedural and substantive due process claims (Counts II and III) because Parada could not be rearrested by Anoka County once placed under lawful arrest by Oman, and because the Court finds that Parada affirmatively abandoned both of her due process claims.  The court will deny summary judgment to Anoka County and Sherriff Stuart on all of Parada's remaining claims.

Finally, the Court will grant in part and deny in part Parada's Motion for Summary Judgment on her Fourteenth Amendment Equal Protection Claim alleged against Anoka County and Sheriff Stuart (Count V).  The Court will grant the Motion as it relates to Anoka County because the policy in question facially discriminates on the basis of national origin and is not narrowly tailored.  The Court will deny Parada's motion as to Sheriff Stuart because a genuine dispute of material fact remains as to whether he is entitled to qualified immunity.

-3-

**BACKGROUND**

I.    **THE ACCIDENT**

At approximately 6:40 p.m. on July 25, 2017, Parada was rear-ended while driving her sister, cousin, and brother home from her sister's fifteenth birthday party in Coon Rapids, Minnesota.  (Aff. of Ryan M. Zipf ("Zipf Aff.") ¶ 2, Ex. 1 ("Parada Depo.") at 21:8–22:7, Dec. 16, 2019, Docket No. 111-1.)  After the accident, the driver that rear-ended Parada, Tara Ackerman, asked to see Parada's driver's license.  (*Id.*)  Parada told Ackerman that she did not have one.[2]  (*Id.*)  Ackerman then called the police.  (*Id.*)  Officer Oman was dispatched to the scene and arrived around 6:46 p.m. (Zipf Aff. ¶ 14, Ex. 13 at 10, Dec. 16, 2019, Docket No. 111-13.)

When Officer Oman arrived at the scene, he first obtained Ackerman's driver's license and used it to verify her identity through the Minnesota driver vehicle database system ("DVS").  (Zipf Aff. ¶ 3, Ex. 2 ("Oman Depo.") at 17:4—18:4, Dec. 16, 2019, Docket No. 111-2.)  The Minnesota Department of Driver and Vehicle Services maintains the DVS

---

[2] Parada has never had a valid Minnesota State Driver's License, or a driver's license issued by any government entity in the United States, Mexico or other jurisdiction. (Parada Depo. at 24:23–25:6).

database, which enables police officers to view a driver's record, including identity data, from a squad car. (Zipf Aff. ¶ 4, Ex. 3 ("Wise Depo.") at 25:8—26:7, Dec. 16, 2019, Docket No. 111-3.)  Though police officers may accept a person's word that the person is who they say they are, checking an individual's driver's license against the DVS database is a primary tool police officers use to identify drivers.  (*Id.* at 46:25—47:6.)

After verifying Ackerman's identity through the DVS system, Officer Oman asked Parada for her driver's license and proof of insurance.  (Oman Depo. at 18:17–23.)  Parada admitted she didn't have a driver's license but provided her address verbally, proof of insurance for the vehicle, and her Matricula Consular card, which is an identification card issued by the government of Mexico.  (Parada Depo. at 43:8–14; Oman Depo. at 18:17–19:14.).  The Matricula Consular card included a picture that matched Parada's likeness, and also matched the name and address Parada provided verbally to Officer Oman. (Oman Depo. at 41:9–21.)  The vehicle registration listed Parada's stepfather, Gabriel Flores, as the insured.  (*Id.* at 41:22—24.)

Officer Oman had not seen a Matricula Consular card before and was unable to verify Parada's identity through DVS.  (*Id*. at 20:10–21, 26:6-8, 89:25—90:8.)  Officer Oman then called dispatch asking if it could verify Parada's identity using the Matricula Consular card, but dispatch could not verify her identity.  (*Id.* 25:17—26:5.)

After being unable to verify Parada's identity through DVS or dispatch, Oman called his supervising officer, Sergeant Madson, to inform him of the situation.  (*Id.* at 28:4–8.)

Oman told Madson that he could not positively identify Parada, and that he intended to place her under arrest for the misdemeanor crime of driving without a license.  (*Id.* at 28:20–29:4.)  Oman testified that he made the decision to arrest Parada because he determined a substantial likelihood existed that Parada would not respond to a citation given at the scene.  (*Id.* at 48:3–6.)  Though Parada was cooperative and did not have a history of failing to appear, Oman stated he was concerned that Parada may have been using a fake identification card or had given him a fake name and address.  (*Id.* at 40:23–41:8; 42:14–17; 50:10–51:8.)  Sergeant Madson concurred in Oman's decision.  (*Id.* at 29:5–6.)

After Oman concluded talking with Sergeant Madson, Parada's stepfather Gabriel Flores arrived at the scene and visually identified Parada as his daughter. (*Id.* at 29:23–25.)  Flores gave Oman his Minnesota driver's license, which listed the same address as Parada's Matricula Consular card.  (*Id.* at 37:8–14.)  Oman was able to verify through DVS using Flores' license that the car Parada was driving was registered to Flores at the same address listed on Flores's Minnesota Driver's license, Parada's Matricula Consular card, and the address Parada provided verbally to Oman.  (*Id.* at 38:18–39:13.)  At this point, Oman testified that he had no doubt that Flores and Parada were related to each other. (*Id.* at 36:22–37:1.)

Despite this corroborating information and Oman's belief that Parada and Flores were related, Oman placed Parada under arrest at approximately 7:00 p.m., stating it

reasonably appeared to him that a substantial likelihood existed that Parada would not respond to a citation.  (*Id.* at 37:20–38:2, 48:7-13; 56:15–57:3.).

## II. OFFICER OMAN'S SOCIAL MEDIA ACCOUNT AND TREATMENT OF SIMILARLY SITUATED NON-HISPANIC PERSONS

Both before and after arresting Parada, Oman made a number of anti-immigrant or anti-Hispanic posts, comments, and reactions on Facebook.  (*See, e.g.*, Oman Depo. at 60:14–72:11.)  For example, Oman—who went by the alias "Otto Rebel Froman" on Facebook—reacted with a "smiley" or "laugh out loud" emoji to a video posted on a "Blue Lives Matter" Facebook page depicting a border patrol agent knocking an immigrant off a ladder before putting the person in a chokehold.  (*Id.* at 59:2–61:17.)  Oman also advocated for building a wall at the country's southern border, and excluding the states of New Mexico and California from the United States because those states are, according to Oman, "liberal and pro illegals."  (*Id.* at 66:19–67:5.)  Oman has also encountered at least six other non-Hispanic persons who were driving without a license and did not place any of the six under arrest.  (Decl. of Alain Baudry ¶ 5, Ex. 4, Jan. 6, 2020, Docket No. 136.)

## III. THE ANOKA COUNTY JAIL

What happened at the Anoka County Jail is somewhat unclear, but at least the following facts have support in the record.

After placing Parada under arrest, Oman drove Parada to the Anoka County jail for processing.  (Oman Depo. at 56:23–57:3.)  Processing through the Anoka County Jail is

comprised of three steps: intake, booking, and release.  (Zipf Aff. ¶ 11, Ex. 10 ("Johnson Depo.") at 17:8–22:25, Dec. 16, 2019, Docket No. 111-10.)  Each step takes approximately fifteen to twenty minutes, and sometimes the intake and booking blend together. (Johnson Depo. at 16:17–20; 17:3–7.)  The Anoka County Jail states that it attempts to process people in the order in which they are brought to the jail, though sometimes that does not occur if the person being processed is uncooperative.  (*See, e.g.*, Zipf Aff. ¶ 8, Ex. 7 ("Pacholl Depo.") at 102:4–13, Dec. 16, 2019, Docket No. 111-7.)

Intake began at approximately 7:22 p.m. when Parada arrived at the jail.  (Oman Depo. at 57:17–19.)  Officer Oman did the appropriate paperwork and informed jail staff that Parada was brought in on book-and-release charges, which meant that after booking Parada was to be released with a citation.  (Oman Depo. at 58:12–16.)

Booking began at approximately 7:37 p.m. (Declaration of Nathan T. Boone ("Boone Decl."), ¶ 12, Ex. 11 at 53:16-19, Jan. 6, 2020, Docket No. 138-11.)  Intake and booking together consist of taking an individual's photograph, fingerprints, running a warrant check, and verifying the individual's identity before the individual is ready for release.  (Zipf Aff. ¶ 7, Ex. 6 ("Lemke Depo.") at 12:11–15:6, 23:4–24:17, Dec. 16, 2019, Docket No. 111-6; Johnson Depo. at 17:8–22:25.)  Per the audit log of Parada's Police Central file, at 9:36 p.m., Booking Deputy Patrick Geertsema changed Parada's status to "Ready for Release." (Boone Decl., ¶ 2, Ex. 1 at 13, Jan. 6, 2020, Docket No. 138–1.)

Booking Deputy Dustin Lemke, who took over for Geertsema around 11:00 p.m.,
however indicated that despite this "Ready for Release" status change in the computer
system, Parada had not completed the booking process by the time he started his shift
because her file was still on his desk.  (Lemke Depo. at 17:14–16, 18:17–19:8.)  Lemke
does not recall whether he interviewed Parada or another deputy interviewed her prior
to his shift starting, but records indicate Lemke contacted ICE at 11:21 p.m. to inform
them of Parada's presence at the jail based on Parada's answer to booking interview
questions that she was a Mexican-born, U.S. Citizen.  (*Id.* at 28:19-25, 29:12-15, 39:13–
40:4; Aff. of Amanda Cefalu ("Cefalu Aff.") ¶ 9, Ex. 8 at 4, Dec. 16, 2019, Docket No. 125-
8 (listing "POB: Mexico (State)" and "US Citizen: Y").)

The Anoka County Jail has an unwritten policy requiring its employees to contact
ICE every time a foreign-born individual is detained, irrespective of whether the person is
a U.S. citizen.  (*See, e.g.*, Cefalu Aff., ¶ 14, Ex. 13, Response to Request for Admissions,
Sheriff James Stuart, at 4, Dec. 16, 2019, Docket No. 125-13.)  Though the policy was
created before Sheriff Stuart was elected, he continued to implement the policy after he
was elected.  (*See id.*; Cefalu Aff. ¶ 11, Ex. 10 at 2, Dec. 16, 2019, Docket No. 125-10.)
During the booking process, individuals are asked to inform the jail where they were born.
If the individual tells the jail that they were born abroad, the jail will send ICE a notification
through a portal system and will also call the local ICE office informing it of the individual's
name, date of birth, country of birth, and any other information the person may have

given the jail.  (Johnson Depo. at 39:3–25.)  The Anoka County Jail attempts to wait to start release procedures for foreign-born detainees until they hear back from ICE.  (*Id.* at 40:3–5.)  This unwritten policy is part of jail employees' training and is employed on a consistent basis.  (Pacholl Depo. at 133:20–23; Lemke Depo. 30:6–24, 33:12–34:8.)

Sometime between approximately 11:21 p.m. and 11:40 p.m., ICE responded to Deputy Lemke's message and requested to speak with Parada.  Parada was retrieved from her holding cell and was told she had a phone call, but was not told who was calling.  (Parada Depo. at 136:8-10.)  After Parada was handed the phone and the ICE official identified themselves, Parada asked the Anoka County Jail deputy if she should have an attorney present and the deputy told her she should ask ICE that question.  (*Id.* 118:18-119:1.)  The ICE official told Parada that the process would go faster if she did not ask for a lawyer.  (*Id.*)  Parada then spoke to ICE without a lawyer before being returned to her cell.[3]  (*Id.* at 136:16–17.)

At approximately 11:40 p.m. ICE faxed a "Warrant for Arrest of Alien" to the Anoka County Jail, requesting that Parada be held subject to ICE's arrival.  (Cefalu Aff. ¶ 9, Ex. 8 at 15, Dec. 16, 2019, Docket No. 125-8.)  The detainer request was shown to Deputy

_____

[3] The Court notes that Parada has recently made concerning, if off-hand, allegations about the Anoka County Jail denying Parada's attorney access to speak with Parada earlier in the evening. Parada does not, however, allege any Sixth Amendment violations in her Complaint nor seek leave to Amend her Complaint to add such a claim.  The Court will therefore not address the matter, other than to note that such allegations are extremely concerning.

Lemke and placed in Parada's file, per standard operating procedure.  (Lemke Depo. at 41:23–42:6.)  The official policy of the Anoka County Jail as of 2014 is to not honor ICE warrants or detainer requests but, as noted above, employees still attempt to wait for ICE before beginning release procedures for all foreign-born individuals presented to the Jail.  (Cefalu Aff. ¶ 11, Ex. 10 at 2, Dec. 16, 2019, Docket No. 125-10.)

ICE arrived at the Anoka County Jail at approximately 1:23 a.m. on July 26, 2017 to take Parada, who had still not been released, into custody.  (*Id.*, Ex. 8 at 14, Dec. 16, 2019, Docket No. 125-8.)  The deputy processing the releases testified that while Parada was cleared for release by this time, he had not yet gotten to Parada's release because he was processing other releases that he received first, and that he had to expedite Parada's release based on ICE's arrival.  (Jackola Aff. ¶ 6, Ex. E at 15:2–24, Dec. 16, 2019, Docket No. 127-5.)  Shortly after ICE's arrival, Parada was handed a citation for driving without a license and transferred into ICE's custody.  Parada is currently in removal proceedings.

## IV.   PROCEDURAL BACKGROUND

Parada filed this action on March 22, 2018, alleging violations of her rights under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, violations of similar provisions under the Minnesota Constitution, a claim for false imprisonment, as well as declaratory and injunctive relief.  (Compl. ¶¶ 124–180, Mar. 22, 2018, Docket No. 1.)

On April 17, 2018, the City of Coon Rapids and Officer Oman (collectively, the "Coon Rapids Defendants") filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Parada failed to state a plausible claim.[4]  (Mot. to Dismiss, Docket No. 8.)

On July 30, 2018, the Court granted in part and denied in part the Coon Rapids Defendants' motion, dismissing Parada's Fourteenth Amendment claims for violations of substantive and procedural due process (Counts II and III), finding that Parada's claims against the Coon Rapids Defendants must instead be analyzed under the Fourth Amendment.  *Parada v. Anoka Cty.*, 332 F. Supp. 3d 1229, 1244, 1246 (D. Minn. 2018) [hereinafter "*Parada I*"].

Since that time, Parada has filed three amended complaints, the latest of which was filed November 18, 2019.  (3rd Am. Compl., Docket No. 99.)  In each Amended Complaint, Parada included the Fourteenth Amendment substantive and procedural due process claims (Counts II and III) that were dismissed as to the Coon Rapids Defendants, but stated in **bold** and underlined type that the claims were "**included here solely so [they were] not deemed waived for purposes of appeal**." (*Id.* at 25–26.)

---

[4] Anoka County, Sheriff Stuart, and John and Jane Doe (collectively, the "Anoka County Defendants") did not participate in Rule 12 motion practice and instead filed an Answer to Parada's Complaint the same day.  (Answer, Apr. 17, 2020, Docket No. 15.)

On December 16, 2019, the parties moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The Coon Rapids Defendants moved for summary judgment on all claims remaining against them, (Docket No. 108), and also moved to exclude Parada's experts under Federal Rule of Evidence 702.  (Docket No. 113.)  Parada moved for partial summary judgment on Count V, her Fourteenth Amendment Equal Protection Clause claim against the Anoka County Defendants.  (Docket No. 119.)  Finally, the Anoka County Defendants moved for summary judgment on all claims against them. (Docket No. 123.)

The Court will consider the Motions for Summary Judgment first, before turning to the Motion to Exclude.

**DISCUSSION**

I.   **SUMMARY JUDGMENT**

A.  **Standard of Review**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most

favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment is appropriate if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The non-moving party may not rest on mere allegations or denials but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256.

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or proper proceeding for redress.

42 U.S.C. § 1983.  Because it is undisputed that Defendants here acted under color of state law, to survive a motion for summary judgment on her § 1983 claims Parada "must raise a genuine issue of material fact as to whether . . . the alleged wrongful conduct deprived [Parada] of a constitutionally protected federal right."  *Luckes v. Cty. of Hennepin, Minn.*, 415 F.3d 936, 939 (8th Cir. 2005) (citing *Kuha v. City of Minnetonka*, 365 F.3d 590, 596 (8th Cir. 2003)).

### B.  Officer Oman's Motion for Summary Judgment

In dispute is whether Officer Oman should be granted summary judgment on Parada's Fourth Amendment claim, her Fourteenth Amendment Equal Protection Clause claim, and her claim for common-law false imprisonment. (Counts I, IV, and VIII, respectively).  Each dispute is considered below.

### 1.  Count I: § 1983 Claim for Fourth Amendment Violation Against Oman

#### a.  Probable Cause for Arrest

Parada argues that her arrest by Oman was constitutionally unreasonable because Oman lacked authority to arrest her under Minnesota Rule of Criminal Procedure 6.01.

The Fourth Amendment protects "against unreasonable searches and seizures" of the person.  U.S. Const. Amend. IV.  A warrantless arrest is reasonable if the officer had probable cause to believe that the suspect committed a crime.  *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citation omitted).  State laws that require more than probable cause to make an arrest do not raise the constitutional standard, however; it remains probable cause.  *Virginia v. Moore*, 553 U.S. 164, 171–72 (2008).

Minnesota Rule of Criminal Procedure 6.01 is titled "Release on Citation" requires an officer to issue a citations for all misdemeanor crimes unless it "reasonably appears that (1) the person must be detained to prevent bodily injury to that person or another; (2) further criminal conduct will occur; or (3) a substantial likelihood exists that the person will not respond to a citation."  Minn. R. Crim. P. 6.01, subd. 1(a).  A history of failing to

respond to citations is a relevant consideration under the third prong. *State v. Brown*, 345 N.W.2d 233, 237 (Minn. 1984) ("Because Officer McCreight was aware that defendant had previously failed to appear for citations issued to him, McCreight could reasonably conclude that there was a substantial likelihood that defendant would again fail to respond to a citation if issued.")

It is undisputed that Parada told Officer Oman during their first encounter that she lacked a valid driver's license and that she was driving when the accident took place.[5] Probable cause to arrest Parada for driving without a license attached at this time, making the arrest constitutionally reasonable. *Id.* And, as the Court has previously noted at the motion to dismiss stage, although each state may implement laws that raise the standard an officer must meet before making an arrest, such state-law arrest limitations do not alter the constitutional standard for determining whether an arrest is reasonable. *Parada I*, 332 F. Supp. 3d at 1240 (citing *Moore*, 553 U.S. at 171–72). Oman's decision to arrest Parada was constitutionally reasonable because Oman had probable cause to believe she was driving without a valid license, even if the arrest was in violation of Rule 6.01. *Id.* at 1241.

_____

[5] Parada also argues that officer Oman violated her Fourth Amendment Rights when Oman failed to call his supervising officer back after receiving corroborating information about Parada's identity from Parada's step-father. Again, this argument relies on Rule 6.01 which has no effect on the constitutional standard for measuring reasonableness under the Fourth Amendment.

### b. Unreasonably Prolonged Stop

Parada also appears to argue that, because Oman lacked authority to arrest Parada under Rule 6.01,  Oman unreasonably extended the stop longer than necessary to issue her a citation.   Although a seizure may be lawful at its outset, it will become unlawful if unreasonably prolonged.  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*

Parada has not presented any evidence indicating that Oman unreasonably extended the stop or expanded the scope of the investigation to attain probable cause. Indeed, the parties agree that Oman attained probable cause to make the arrest near the outset of arriving on the scene. Further, Oman's entire investigation into the accident lasted approximately 15 minutes.  Although Parada has presented evidence that, when viewed in a light most favorable to her, shows Oman may have selectively enforced the law in violation of the Fourteenth Amendment's Equal Protection Clause, the subjective intent of the officer is not taken into consideration when the Fourth Amendment is at issue. *Whren v. United States*, 517 U.S. 806, 813 (1996).

Accordingly, the Court will grant Officer Oman's Motion for Summary Judgment on Count I, Parada's § 1983 claim that her arrest was in violation of the Fourth Amendment.

## 2. Count IV: § 1983 Claim for Fourteenth Amendment Equal Protection Clause Violation Against Oman

The Equal Protection Clause of the Fourteenth Amendment "prohibits selective enforcement of the law based on considerations such as race." *Id.* A selective-enforcement claim requires proof that the officer exercised their discretion to enforce the laws on account of the plaintiff's race, nationality, or other suspect classification and that enforcement of the law had a discriminatory effect and purpose. *See Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003). "When the claim is selective enforcement of the traffic laws or a racially-motived arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose." *Id.*

Here, Parada has presented evidence indicating that Officer Oman did not arrest the six other, non-Hispanic individuals he encountered for driving without a license.[6] *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 337 (1977) (using Spanish-surnames to identify minority individuals). Parada has also shown that she (1) verbally provided her

---

[6] Oman argues that these six individuals were not similarly situated to Parada because Oman verified their identity through DVS. "Similarly situated" does not mean "identically situated." *Cf. Kucia v. Se. Ark. Cmty. Action Corp.*, 284 F.3d 944, 947 (8th Cir. 2002) (discussing evidence presented at trial that would allow a reasonable jury to draw the inference of disparate treatment in Title VII action). Parada has presented enough evidence to allow a reasonable jury to draw an inference that Officer Oman's decision to arrest Parada was based upon a discriminatory effect and purpose.

name and address to Oman; (2) gave him proof of insurance listing her stepfather as the car owner; (3) presented her Matricula Consular card to him that included her photo and an address that matched the address Parada verbally provided; and (4) was cooperative and did not have a history of failing to respond to citations.[7]   Further, when Parada's stepfather arrived on the scene, he identified Parada as his stepdaughter and corroborated her identity and address.   Oman also verified Flores' identity and address through DVS, which was the same address Parada gave to Oman verbally and that was listed on her Matricula Consular card issued by the Mexican government.   Oman testified that he had no doubt that Flores and Parada were related.

Moreover, Parada has presented evidence of Officer Oman's social media accounts that could allow a reasonable jury to conclude Oman harbors animus towards Mexicans specifically, or Hispanics, immigrants, and non-citizens present in United States generally.[8]

_____

[7] Though Rule 6.01 does not alter the probable cause standard, it may be considered as part of the factual context of whether Oman selectively enforced the law.  The history of Rule 6.01 indicates that it was adopted in 1975 as part of a larger, national effort to prevent discriminatory arrests for minor crimes and selective enforcement of the law.  *Minneapolis Police Dep't v. Kelly*, 776 N.W.2d 760, 768 (Minn. Ct. App. 2010) (citing *ABA Standards of Criminal Justice* §§ 10–2.2 cmt., 10–2.3 cmt. (2d ed. 1980)).

[8] The Court again rejects Officer Oman's argument that he is entitled to qualified immunity because the law is not clearly established that local law enforcement is constitutionally required
*(footnote continued on next page)*

Viewing all of this evidence in a light most favorable to Parada, as the Court must, a reasonable jury could find that Oman selectively enforced the law based on Parada's race, national origin, or alienage in violation of her Fourteenth Amendment right to equal protection under the law.

Accordingly, the Court will deny Officer Oman's Motion for Summary Judgment on Count IV, Parada's Fourteenth Amendment Equal Protection Clause claim. Because of this, the Court will also deny Oman's motion to the extent it seeks summary judgment on the issue of punitive damages.[9]

---

to accept a Matricula Consular card as a form of identification. *See Parada I*, 332 F.Supp. 3d at 1245. As the Court has previously noted, "Oman stretches this theory too thin." *Id.* It is "beyond debate" that when an officer enforces the law due to a person's race, ethnicity, national origin, or alienage, a cause of action under the Fourteenth Amendment's Equal Protection Clause lies, and a reasonably competent officer would know as much. *Wesby*, 138 S. Ct. at 589 (internal citation omitted); *Whren*, 517 U.S. at 813. Parada has shown sufficient facts that, when viewed in a light most favorable to her, would allow a reasonable jury to conclude Officer Oman violated this clearly established right. Accordingly, Oman is not entitled to qualified immunity. *Lombardo v. City of St. Louis*, 956 F.3d 1009, 1013 (8th Cir. 2020) ("In making a qualified immunity determination, we apply a two-prong inquiry: '(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" (quoting *Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013)).

[9] Parada lists a claim for punitive damages as Count IX in her complaint but this claim hinges on a constitutional violation being found against Officer Oman.

### 3.  Count VIII: Common Law False Imprisonment

"The action for the tort of false imprisonment or false arrest protects the personal interest in freedom from restraint of movement." *Joseph v. Donahue*, 392 F. Supp. 3d 973, 992 (D. Minn. 2019) (quoting *Lundeen v. Renteria*, 224 N.W.2d 132, 135 (1974)). "[T]he essential elements of plaintiff's claim for relief are (1) an arrest performed by defendant, and (2) the unlawfulness of such arrest." *Lundeen*, 224 N.W.2d at 135.  An arrest is lawful for false imprisonment purposes if probable causes exists. *Johnson v. Morris*, 453 N.W.2d 31, 36 (Minn. 1990).[10]  Because Oman had probable cause to make the arrest, Oman is entitled to summary judgment on Parada's claim for false imprisonment. *Id.*

Accordingly, the Court will grant Oman's Motion for Summary Judgment on Count VIII, Parada's claim for common law false imprisonment.

---

[10] The Court notes that it does not appear that the Minnesota Supreme Court has directly considered whether Rule 6.01 may affect a claim for false imprisonment, and Parada does not premise her false imprisonment claim here on a violation of Rule 6.01.  Even if she had, Oman would still be entitled to summary judgment on this claim because Parada did not dispute Oman's claim to official immunity under state law. *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990) ("As distinguished from the 'qualified immunity' afforded peace officers when addressing 42 U.S.C. § 1983 claims, under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion.")

### 4.  Conclusion on Parada's Claims Against Oman

The Court will grant in part and deny in part Oman's Motion for Summary Judgment. The Court will grant summary judgment on Parada's Fourth Amendment and false imprisonment claims (Counts I and VIII respectively) as no genuine dispute of material fact remains and Oman is entitled to judgment as a matter of law.  The Court will deny summary judgment, however, on Parada's Fourteenth Amendment Equal Protection Clause claim (Count IV) because a genuine dispute of material fact remains as to whether Oman selectively enforced the law based on Parada's race, national origin, or alienage, and Oman is not entitled to qualified immunity.

### C.  Anoka County, Sherriff Stuart, and Parada's Cross Motions for Summary Judgment

Turning to Parada's claims against Anoka County and Sheriff Stuart, the Court must decide whether Anoka County and Anoka County Sheriff Stuart should be granted summary judgment on Parada's Fourth Amendment, Fourteenth Amendment, state Constitution, and common-law false imprisonment claims (Counts I–III, V–VIII).  Parada also seeks summary judgment on her Fourteenth Amendment Equal Protection Clause claim (Count V).  Each dispute is considered below.

### 1.  Count I: § 1983 Claims for Violation of Fourth Amendment

Parada argues that her extended detention at the Anoka County Jail violated her Fourth Amendment right against unreasonable searches and seizures because, she

alleges, she was held after she was cleared for release to give ICE time to arrive and detain her.

"The flaw in this argument is that a person who is already under arrest and in police custody cannot be 'rearrested.'"  *Garionis v. Newton*, 827 F.2d 306, 310 (8th Cir. 1987). Following a constitutionally reasonable arrest, claims that a person was held longer than constitutionally allowed based on that arrest must be analyzed under the Fourteenth Amendment's Due Process Clause.  *See Luckes v. Cty. of Hennepin, Minn.*, 415 F.3d 936, 939 (8th Cir. 2005).  Because the Court has already found that Parada's arrest was constitutionally reasonable under the Fourth Amendment, Parada's claim that her extended detention at the Anoka County Jail violated her Fourth Amendment right to be free from unreasonable seizure fails.  *Id.* (citing *Armstrong v. Squadrito*, 152 F.3d 564, 569–70 (7th Cir. 1998)).

Accordingly, the Court will grant Anoka County and Sheriff Stuart's Motion for Summary Judgment on Count I, Parada's Fourth Amendment § 1983 claim.

### 2. Counts II & III: § 1983 Claims for Violations of Fourteenth Amendment Substantive and Procedural Due Process

The parties dispute whether Parada affirmatively abandoned her Fourteenth Amendment substantive and procedural due process claims alleged against Anoka County and Sheriff Stuart.

The Court previously dismissed these claims as they related to the Coon Rapids Defendants, finding that the Fourth Amendment, not the Fourteenth Amendment,

governed Parada's claims against those defendants' actions related to her arrest.  *See Parada I*, 332 F. Supp. at 1244 ("Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for the analysis of these claims." (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).  In Parada's First, Second, and Third Amended Complaints, however, Parada stated in **bold** and <u>underlined</u> type that her substantive and procedural due process allegations under the Fourteenth Amendment, had "**<u>been dismissed by Order of the Court and [are] included here solely so [they are] not deemed waived for purposes of appeal</u>**."  The Anoka County Defendants' did not substantively respond to these Counts in their Answer because of this disclaimer statement.

The Court takes an equitable approach to determine whether Parada affirmatively abandoned these claims.  *Davis v. White*, 794 F.3d 1008, 1016 (8th Cir. 2015).  The Court considers the length of time the opposing party was on notice of the claim and whether the party making the claim undertook discovery on the claim.  *Id.*  The ultimate determination is whether the Anoka County and Sheriff Stuart would be prejudiced if the Court allowed the claims to proceed.  *Id.*

Parada affirmatively stated in her three amended complaints spanning approximately two years that Counts II and III were included in the Complaint only for purposes of appeal.  Parada has not addressed her statement disclaiming the Counts, nor

does she point to any specific discovery taken on these Counts.  Both parties should have

known that the Court did not dismiss these claims.  However, the fact remains that the

Anoka County Defendants did not substantively address the claims in their filed Answers,

relying instead on Parada's statements in her Complaint that the Counts were alleged

solely for purposes of appeal.  Parada could have corrected the Anoka County Defendants'

understanding as indicated by their Answer, altered the disclaimer statement in her

Amended Complaint, or taken discovery related to the claims.  Because she did not, the

Court finds that allowing the claim to proceed would be prejudicial to Anoka County and

Sheriff Stuart and that Parada has affirmatively abandoned her Fourteenth Amendment

Due Process Clause claims included in Counts II and III of her Complaint.

Accordingly, the Court will grant Anoka County and Sheriff Stuart's Motion for

Summary Judgment on Counts II and III, Parada's substantive and procedural due process

claims.

### 3. Count V: Cross Motions for Summary Judgment on Fourteenth Amendment Equal Protection Clause

#### a. *Constitutionality of the Policy*

The parties make cross motions for summary judgment on Parada's Equal

Protection Clause claim in Count V.  Parada argues the Anoka County Jail's unwritten

policy of contacting ICE anytime a foreign-born individual is brought to jail (the "ACJ

policy") violates the Equal Protection Clause of the Fourteenth Amendment because the

policy discriminates on the basis of national origin and is not narrowly tailored to further a compelling government interest.[11]

First is the question of the appropriate level of scrutiny. Anoka County and Sheriff Stuart argue that the ACJ policy—which treats US-born individuals differently from foreign-born individuals, irrespective of citizenship or immigration status—is not subject to strict scrutiny because the Supreme Court has "expressly rejected" the idea that immigrants entering the United States without inspection, admission, or parole constitute a suspect class. *United States v. Loaiza-Sanchez*, 622 F.3d 939, 941 (8th Cir. 2010). But he ACJ policy does not classify based on the immigration status of individuals. Instead, the policy facially discriminates on the basis of the individual's birth country. This type of national origin discrimination is "inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971).[12] Similar to policies that discriminate

---

[11] As long as there is evidence that it is customary practice, an unwritten policy can form the basis for a § 1983 claim. *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (citing *Davison v. City of Minneapolis*, 490 F.3d 648, 659 (8th Cir. 2007).

[12] *See also Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) (defining "national origin" as "the country where a person was born, or, more broadly, the country from which his or her ancestors came."). Additionally, Defendants argue their facially discriminatory policy based only upon the individuals' place of birth is not subject to strict scrutiny because animus cannot be proscribed to each and every foreign country in which a person may be born. But animus is not required to trigger strict scrutiny; only disparate treatment based on a suspect classification. That requirement is easily met here.

on the basis of race, to pass constitutional muster Anoka County and Sheriff Stuart are required to show that the ACJ policy is narrowly tailored to further a compelling government interest. *See Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013) (noting that any government "action that treats a person differently on account of [their] race or ethnic origin is inherently suspect'" and subject to strict scrutiny).

Defendants argue that being a "good law enforcement partner" by identifying inmates who may be "of interest" to a federal law enforcement agency is a compelling interest. *See Arizona v. United States*, 567 U.S. 387, 411 (2012) (noting in dicta that "[c]onsultation between federal and state officials is an important feature of the immigration system.")

Defendants make no real argument that the policy is narrowly tailored. Indeed, such an argument would be nearly impossible, given the under- and over-inclusive nature of the ACJ policy, which excludes US-born non-citizens,[13] but sweeps up foreign-born US citizens and immigrants who were inspected, admitted, and paroled into the United States, and in whom ICE would have no interest. Instead, Defendants argue that in practice, the ACJ policy only affects "undocumented aliens" because they are mostly likely to be subject to removal by ICE, and further, because Parada is not an American citizen,

---

[13] *See, e.g., Ali v. Dist. Dir., Mia. Dist., U.S. Citizenship & Immigr. Servs.*, 743 F. App'x 354, 358 (11th Cir. 2018) (noting a "person born in the United States to a foreign diplomatic officer accredited to the United States . . . is not a United States citizen under the Fourteenth Amendment").

she cannot allege she was discriminated against by the policy.  Defendants do not dispute that Parada was, however, subject to additional steps in the booking process based solely on her national origin.  That such additional processes are discriminatory is particularly clear here, given that Defendants admit that they believed Parada to be a U.S. citizen at the time.[14]   Thus, assuming without deciding that being a "good law enforcement partner" is a compelling state interest,[15] the ACJ policy still fails because it is not narrowly tailored.

Because the policy is facially unconstitutional, Anoka County, as a municipality, may be held liable.  *See Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008) (discussing two circumstances warranting municipality liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)).

---

[14] Though not directly at issue here, the Court notes that the ACJ policy also undoubtedly creates a second-class of citizens and subjects them to a different, more rigorous set of standards during the booking process that insults their dignity and delays their release for the sole reason that they were not born in the United States.  *See Schneider v. Rusk*, 377 U.S. 163, 169 (1964) (prohibiting the creation of a "second-class citizenship").

[15] Defendant's reliance on *Arizona v. United States* is likewise unavailing.  567 U.S. 387 (2012). Defendants argue that *Arizona* allows for state officials to contact ICE to determine the immigration status of detainees "as a routine matter."  *Id.* at 413.  But, *Arizona* dealt with a specific state law that is not at issue here, and even then, before attempting to discern the immigration status of an individual stopped or detained for a different, legitimate, reason, the Arizona law required reasonable suspicion that the individual was "an alien and [was] unlawfully present in the United States" and prohibited the consideration of national origin in gaining such suspicion.  *See Arizona*, 567 U.S. at 411.  The ACJ policy, as noted, relies only on national origin discrimination.

Accordingly, the Court will grant Parada's Motion for Summary Judgment as it relates to Anoka County, with the issue of damages to be decided at trial.

### b.   Qualified Immunity for Sheriff Stuart

Despite the unconstitutional policy, Sheriff Stuart argues that he cannot also be found liable because he is entitled to qualified immunity.

"Qualified immunity shields a public official from damage liability unless the official's actions violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *S.M. v. Krigbaum*, 808 F.3d 335, 339 (8th Cir. 2015) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  When qualified immunity is sought against a supervisor of the actor that actually committed the constitutional violation at issue, the supervisor may be "liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue."  *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)).

Direct action may be found if the supervisor is "involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions."  *Id.*  (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)).  When "failure to train or supervise the offending actor" forms the basis of § 1983 liability, "the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of

unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Krigbaum*, 808 F.3d at 340 (quoting *Livers v. Schenck,* 700 F. 3d 340, 355 (8ᵗʰ Cir. 2012)).  The notice standard is "rigorous" and "requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right."  *Id.*  The deliberate indifference standard is similar to criminal recklessness and the official must "both be aware of facts from which the inference could be drawn that a substantial risk of [unconstitutional] harm exists, and he must also draw the inference."  *Id.* at 341 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

Under the direct-action theory, a genuine dispute of material fact remains as to whether Sherriff Stuart was involved in applying or interpreting the ACJ policy.  Sherriff Stuart readily admits that he was aware of the ACJ policy employed at his jail that discriminates solely based on national origin.  Although Sherriff Stuart testified that the policy was created before he took office, he also testified that it continued under his watch.  Parada also presented evidence showing that in 2014, the Anoka County Jail decided to stop officially honoring ICE detainer requests, but that it would continue contacting ICE whenever a foreign-born person was brought to the jail.  A reasonable jury could infer that Sherriff Stuart, as the head law enforcement officer, was involved in and/or directed this decision.  A reasonable jury could therefore find that Sherriff Stuart's

direct action in continuing to apply or interpret the unwritten policy led to the unconstitutional conditions that occurred here.

Furthermore, under the failure to train or supervise theory, it is undisputed that Sherriff Stuart was on notice of the ACJ policy that created a pattern of conduct at the Anoka County Jail to discriminate against individuals based solely on their national origin. It is also undisputed that such discrimination violates a clearly established constitutional right. *See, e.g.*, *Graham*, 403 U.S. at 371–72 ("But the Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." (footnotes omitted)). A genuine dispute of material fact remains as to whether the Sherriff was deliberately indifferent to the policy. The fact that the Sherriff knew of the policy and continued to allow Jail staff to enforce it could lead a reasonable jury to conclude that the Sheriff was aware that a substantial risk of unconstitutional harm existed by continuing to implement the policy.

Accordingly, the Court finds a genuine dispute of material fact remains as to whether Sheriff Stuart is entitled to qualified immunity and the Court will deny both Parada's and Sheriff Stuart's Motion for Summary Judgment as they relate to Sheriff Stuart.

### c.   Conclusion on Count V

In sum, because the ACJ policy facially discriminates on the basis of national origin and is not narrowly tailored, the Court will grant Parada's Motion for Summary Judgment

as it relates to Anoka County with damages the only issue remaining for trial. However, because a genuine dispute of material fact exists as to whether Sheriff Stuart is entitled to qualified immunity, the Court will deny Parada's motion as to Sheriff Stuart. For the same reasons, the Court will also deny Anoka County and Sheriff Stuart's Motion for Summary Judgment on Count V.

### 4. Count VI, VII, VIII, X, and XI: State Constitutional Violations, False Imprisonment, Declaratory Judgment, and Injunctive Relief

Anoka County and Sheriff Stuart argue that summary judgment is appropriate on Parada's Minnesota Constitutional Claims for Unlawful Seizure and violations of her state Due Process rights, (Counts VI and VII), Parada's common-law false imprisonment claim, (Count VIII), and Parada's Declaratory Judgment and Permanent Injunction claims, (Counts X and XI), because each claim depends on Parada proving that she was held in the Anoka County Jail longer than she should have been based only on the fact that she was (1) born abroad and (2) the jail's interactions with ICE.

When viewing the facts in a light most favorable to Parada, a reasonable jury could conclude Anoka County deputies slow-walked Parada's release based solely on their interactions with ICE, which occurred solely because Parada was foreign-born. Parada has presented evidence indicating that Anoka County, while not officially honoring ICE detainer requests, attempts to wait for ICE before releasing foreign-born detainees. Parada has also presented evidence showing that she was cleared for release at

approximately 9:30 p.m., and that each and every foreign-born detainee is subject to additional steps in the booking process that U.S.-born individuals are not subjected to.

Anoka County presented contrary evidence, including the fact that Anoka County's official policy is to not honor ICE detainer requests or hold foreign-born detainees solely to wait for ICE to arrive, that Parada had the third-shortest incarceration time of the 43 inmates brought to the Anoka County Jail that day, and that her booking process was not actually finished until much later than 9:30 p.m.  Even so, a genuine dispute of material fact remains, and the jury must decide this question.

Accordingly, the Court will deny Anoka County's Motion for Summary Judgment on Counts VI, VII, VIII, X and XI.

## II.   COON RAPIDS DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY UNDER FED. R. EVID. 702

The Coon Rapids Defendants move to exclude the expert testimony of Parada's experts C.T. Anderson and Roy Bedard.  Parada does not object to the exclusion of C.T. Anderson, whose testimony only pertained to the City of Coon Rapids, as Parada has dropped all claims against the City.  Parada does object to the exclusion of Roy Bedard, whose expert testimony appears to relate to whether Officer Oman violated Parada's Fourth Amendment rights.  The Court has, however, found that Officer Oman is entitled to summary judgment on that claim.  The Court will therefore deny the Coon Rapids Defendants' Motion to Exclude as moot, while noting that they may renew the motion if

Parada plans to have Bedard testify regarding her remaining Fourteenth Amendment claim.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment on Count V [Docket No. 119] against Defendants Anoka County and Anoka County Sheriff James Stuart is **GRANTED in part and DENIED in part** as follows:

    a. **GRANTED** as to Anoka County with the issue of damages to be decided at trial;

    b. **DENIED** as to Sheriff Stuart as a genuine dispute of material fact remains as to whether Sheriff Stuart is entitled to qualified immunity.

2. Anoka County Defendants' Motion for Summary Judgment [Docket No. 123] is **GRANTED in part and DENIED in part** as follows:

    **a. GRANTED** as to John and Jane Doe on all Counts;

    **b. GRANTED** as to Anoka County and Sheriff Stuart as to Counts I–III;

    **c. DENIED** as to Anoka County and Sheriff Stuart as to Counts V–XI;

3. Coon Rapids Defendants' Motion for Summary Judgment [Docket No. 108] is **GRANTED in part and DENIED in part** as follows:

    **a. GRANTED** as to the City of Coon Rapids on all Counts;

      **b.** **GRANTED** as to Officer Nicolas Oman on Counts I, VI, VII, and VIII;

      **c.** **DENIED** as to Officer Nicolas Oman on Counts IV and IX

4.     Coon Rapids Defendants' Motion to Exclude [Docket No. 113] is **DENIED as**

**MOOT.**

DATED:  August 25, 2020              _____
at Minneapolis, Minnesota.              JOHN R. TUNHEIM
                                       Chief Judge
                        United States District Court